**Lenny FINKELSHTEYN, Plaintiff,**

v.

**STATEN ISLAND UNIVERSITY HOSPITAL, Defendant.**

**No. 06–CV–4774 (RRM)(RML).**

United States District Court, E.D. New York.

March 31, 2009.

Thomas F. Bello, Thomas F. Bello, Esq. P.C., Staten Island, NY, for Plaintiff.

David O. Simon, Kenneth John Kelly, James Douglas Williams, Jr., Epstein, Becker & Green, P.C., New York, NY, for Defendant.

## MEMORANDUM & ORDER

MAUSKOPF, District Judge.

Plaintiff Lenny Finkelshteyn, a registered nurse formerly employed by Defendant Staten Island University Hospital ("SIUH" or the "Hospital"), claims that because of his Jewish faith he was subjected to actionable discrimination, including a pervasively hostile work environment, disparate treatment, constructive discharge, and retaliation. Finkelshteyn brings this civil rights action against SIUH pursuant to Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*[1] For the reasons below, SIUH's motion for complete summary judgment is GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND [2]

Beginning in 1998, Finkelshteyn was employed by SIUH as a fulltime, night-

---

1. Upon stipulation dated August 8, 2007, Finkelshteyn discontinued with prejudice any and all claims predicated upon race discrimination; i.e., causes of action pursuant to 42 U.S.C. §§ 1981 and 1983. His sole remaining claim of religious discrimination is analyzed pursuant to Title VII.

2. Unless otherwise indicated, the facts set forth here, and in the Discussion section below, are uncontroverted and are culled from the summary judgment record. The following Moving papers comprise part of the record: Defendant's 56.1 Statement; Notice of Motion for Summary Judgment dated Oct. 26, 2007; Defendant's Memorandum of Law; and the Decl. of James D. Williams, Jr. sworn Oct. 26, 2007, together with the following annexed exhibits: (a) Amended Complaint dated Dec. 4, 2006; (b) Amended Answer dated Jan. 24, 2007; (c) Stipulation of Dismissal with Respect to Claims of Race Discrimination dated Aug. 8, 2007; (d) Deposition of Lenny Finkelshteyn (the "Finkelshteyn Dep."); (e) excerpt of the Deposition of Joseph Pitta (the "Pitta Dep.").

The following submissions in Opposition comprise part of the record: Plaintiff's Memorandum of Law in Opposition; Plaintiff's 56.1 Counter–Statement; Affidavit of Lenny Finkelshteyn sworn Dec. 14, 2007 (the "Finkelshteyn Aff."); the Affidavit of Stanislav Lando sworn Dec. 14, 2007. Plaintiff's Opposition is further supported by the following exhibit submissions, although the Court notes that they were improperly annexed to Plaintiff's Memorandum of Law, rather than to an attorney declaration: (a) Finkelshteyn's annual SIUH performance evaluations; (b) Letter by Lenny Finkelshteyn to Brenda Bell dated Dec. 23, 2005; (c) List of CTU employees listed by identified religious affiliation; (d) Amended Complaint dated Dec. 4, 2006; (e) Finkelshteyn Dep.; (f) Pitta Dep.; (g) Deposition of Maria Casella (the "Casella Dep."); (h) Deposition of Violeta Coleman (the "Coleman Dep.").

The following Reply submissions comprise the remainder of the record: Defendant's Reply Memorandum of Law; Defendant's Reply to Plaintiff's 56.1 Counter–Statement; and the Affidavit of Joseph Pitta (the "Pitta Aff."), together with the following annexed exhibits: (1) SIUH Human Resources Policies and Procedures Manual dated Sept. 2004; (2) Finkelshteyn's 1999 SIUH performance evaluation; (3) Finkelshteyn's 2002 evaluation; (4) Finkelshteyn's 2003 evaluation; (5) Finkelshteyn's 2004 evaluation; (6) Finkelshteyn's 2005 evaluation; (7) Finkelshteyn's 2006 evaluation; (8) Finkelshteyn verbal disciplinary warning documentation dated July 5, 2000; (9) Notice of Disciplinary Action against Finkelshteyn dated 2001; (10) Finkelshteyn verbal disciplinary warning documentation dated July 13, 2003; (11) Notice of Disciplinary Action against Finkelshteyn dated July 14, 2004; (12) Notice of Disciplinary Action against Finkelshteyn dated February 18, 2005; (13) Notice of Disciplinary Action against Finkelshteyn dated July 15, 2005; (14) Notice of Disciplinary Action against Finkelshteyn dated Nov. 16, 2005; (15) Lenny Finkelshteyn Absentee Calendar 2005; (16) New York State Nurses Assoc. Grievance Form dated Nov. 17, 2005; (17) Notice of Disciplinary Action against Stacie Picone dated Aug. 30, 2005; (18) Notice of Disciplinary Action against Nancy Levoyce dated Oct. 12, 2005; (19) Notice of Disciplinary Action against Donna Leach dated Nov. 7, 2005; (20) Notice of Disciplinary Action dated July 24, 2005; (21) Letter from Lenny Finkelshteyn to R. Wittenstein dated Dec. 23, 2005; (22) Letter from Lenny Finkelshteyn to Joseph

shift nurse in the Hospital's Cardiothoracic Unit (the "CTU"). In connection with his various claims of civil rights discrimination, Finkelshteyn complains about the conduct of certain co-workers, as well as CTU supervisors Joseph Pitta and Maria Casella. Pitta and Casella were respectively appointed as the CTU Manager and Assistant Manager in May 2004.

### A. *Hostile Work Environment*
#### 1) *Anti–Israeli comments*

Finkelshteyn complains that co-workers made comments about Israel that he felt were offensive and indicative of anti-Semitism, comments which Finkelshteyn claims were implicitly condoned by SIUH management and which fostered a demeaning and hostile work environment. In his supporting affidavit, Finkelshteyn testified, in pertinent part, as follows:

> My supervisors always condoned anti-Semitic remarks such as, on one occasion a nurse by the name of Nancy Levoyce from my unit while watching a news report ridiculed Israelis by stating that they needed to leave the country that they were fighting in, while saying that she was looking at me in such a way that gave me the impression she was thinking about my religion.

(Finkelshteyn Aff. at ¶ 9.)

Finkelshteyn further alleges that Pitta, who was standing nearby, did nothing to intervene. When asked whether Pitta had made any offensive remarks during that exchange, Finkelshteyn testified that Pitta had not, but that he had "smiled." Finkelshteyn also testified that he did not complain about the incident to SIUH's Human Resource Department, nor did he tell Pitta

that he had found his co-worker's comments offensive. (Finkelshteyn Dep. at pp. 39–40.)

#### 2) *Finkelshteyn's tattoo*

In or about mid–2005, Finkelshteyn had the emblem and Hebrew initials of the "Israeli Defense League" (described by Finkelshteyn as a counter-terrorism, special forces unit of the Israeli military) tattooed on his upper-arm. According to Finkelshteyn, "Maria Casella saw my tattoo, she looked at it and said I'm crazy for making this tattoo." (*Id.* at pp. 44–45). However, his deposition testimony indicates that Finkelshteyn did not know what Casella meant, if anything, by her remark:

> She said that I'm crazy but [I] can't recall what she meant by crazy, that I'm crazy that I belong to Jewish, because I'm Jewish, or because I did the tattoo. It was like a general statement. I don't know what she was referring to.

(*Id.* at pp. 48–49.)

#### 3) *Casella's conduct*

Finkelshteyn claims that Casella, his direct supervisor, was generally "loud," "inappropriate," "unethical" and "offensive." (*Id.* at pp. 50–51.) He cites several examples of her specific comments toward an ever widening array of Hospital staff and patients, including disparaging racial and ethnic remarks about African–American and Chinese employees and anti-Semitic remarks about Jewish patients. (*Id.*) Finkelshteyn complains that Casella's alleged bigotry created an actionably hostile work environment, and influenced others' negative attitudes toward him, including Pitta. For example, Finkelshteyn testified as follows:

Pitta dated Jan. 13, 2006; (23) Letter from Joseph Pitta to Lenny Finkelshteyn dated Jan. 23, 2006; (24) Letter of Resignation from Lenny Finkelshteyn to Joseph Pitta, Maria Casella dated July 14, 2006; (25) SIUH Schedule Codes for Res–Q; (26) Letter from Erica Cotto to Leonid Finkelshteyn dated Aug. 23, 2006; (27) SIUH Human Resources Policies and Procedures Manual dated Dec. 25, 2005.

Q. Did you ever hear her use the words, racially derogatory words such as "nigger" or "WOP" or "MOP"?

A. Yes.

Q. You did?

A. Yes. We had actually one person who is black working on the unit, she is a registered nurse and she is also Muslim.... She [Casella] was calling her that while she [the nurse] wasn't there.

Q. So in your opinion Maria was just offensive in general to a lot of different people?

A. In general she was very offensive, yes....

* * *

A. ... So what happened is they had a Chinese nurse at that time working on the unit. What Maria was saying in front of everyone, I heard it, Joe Peta [sic] was laughing, she personally didn't like that nurse, I don't know for what reason, but she was screaming aloud on the unit "I'm going to fire this fucking Chinese bitch." That is exactly her words....

(*Id.*, at pp. 57–60.)

With respect to anti-Semitic comments, Finkelshteyn alleges that on at least one occasion in 2005, he overheard Casella describe a "difficult" patient as a "fucking Jew Head." (*Id.* at pp. 50–51.) Finkelshteyn testified, in pertinent part, as follows:

A. She was referring to a patient and was giving a report to another nurse. It was very offensive, I'm Jewish, and she is talking about someone else who is patient who is Jewish also.

* * *

Q. What does that mean?

A. She didn't like somehow the patient itself, that she was noisy or the patient was demanding. Sometimes nurses talking how, you know, how difficult it is to work with this patient, so she expresses herself by telling the nurse who is going to be in charge for night how that person demanding by giving expression "fucking Jew head."

(*Id.* at p. 51.)

* * *

Q. You said it occurred in around 2005?

A. Yes.

Q. Do you remember what time period? Was it spring, summer, fall?

A. From beginning of 2005 until the summer.

Q. Did you hear this comment more than one time from Maria?

A. I heard couple of times....

Q. ... You told me about the fucking Jew head. Were there any other comments that Maria Casella said?

A. That was the most serious I heard.

Q. Any other comments?

A. In general, when she was giving report, yes, she was talking about Jewish, how nasty they are and stuff like that. It wasn't referred to me, but as I said, I wouldn't walk into the office when she is talking like this. I would just turn around and walk away because I didn't want to start confrontation.

(*Id.* at pp. 52–53.)

In support of his Opposition to summary judgment, Finkelshteyn also submits an affidavit from a former CTU employee, Stanislav Lando. It is Lando's testimony that on an unspecified date, but prior to 2005, he overheard Casella say, "We have three problems on this unit—the Blacks, the Chinese, and the Jews," and then overheard Casella describe Finkelshteyn as a "Jew Head," saying, "... we'll get rid of him soon enough." (Lando Aff. at ¶ 5.)

Finally, Finkelshteyn alleges that Casella's bigotry, particularly her anti-Semitic

bias, manifested itself in the form of oppressive work assignments. Finkelshteyn testified that he was given a disproportionately high number of larger, heavier patients, as well as a higher number of critically ill patients, all of whom required greater attention, time, and physical effort to care for. (Finkelshteyn Dep. at pp. 68–69, 76–77.) As discussed more fully below, the view that Finkelshteyn's work assignments were considerably more difficult than those of his co-workers is also supported by the deposition testimony of CTU employee Violeta Coleman:

Q. Did he say what was it about his work assignments that was more difficult than the others?

A. Well, we could see it. He never got easy assignments.

Q. So, you would agree that he did?

A. Yes.

Q. So, would you you would say, that his complaints were valid?

 \* \* \*

A. Yes.

(Coleman Dep. at pp. 24–25.)

### B. *Disparate Treatment*

On November 06, 2005, Pitta suspended Finkelshteyn for two days. That suspension was based upon four documented absences on September 5th, October 6th, October 18th, and November 10th. By letter to SIUH administration dated December 23, 2005, Finkelshteyn complained that certain of those absences, particularly the October and November absences, were health related and expressly authorized by SIUH's Employee Health Services Department. As such, he argued that these absences were not "unexcused," and should not have factored into his suspension.

In that letter, Finkelshteyn complained of anti-Semitic discrimination for the first time, stating in part as follows:

In my opinion, according to my observations, both my managers [Casella and Pitta] are very lenient with other nurses on my unit who frequently call out. They were never suspended nor threatened with termination. Additionally, these nurses have worked on the CTU for much less time than I have. Obviously, favoritism plays a big part with them. I feel that the unfair actions taken by my managers are from their personal outlook upon me, and religious discrimination. I feel that I was a victim of racial bias . . . . [3]

Finkelshteyn filed a union grievance, and a hearing on the matter was held on January 19, 2006. Present at that time were Finkelshteyn's union representative, Pitta and SIUH administrators Erica Cotto and Stephanie Salvatore. It is uncontested that at that hearing, Finkelshteyn voluntarily withdrew his grievance and accepted his disciplinary suspension. The circumstances surrounding the matter, however, are described below.

SIUH concedes that Finkelsheyn's October and November 2005 absences were medically authorized and therefore excused. However, SIUH contends that the circumstances surrounding his absence on

---

**3.** The Court notes that in his December 23, 2005 letter, Finkelshteyn claimed to have an audiotape of Pitta and Casella making unspecified anti-Semitic comments. The tape was allegedly made in 2004, prior to Casella becoming a CTU supervisor, and possibly prior to Pitta's promotion as well. (Finkelshteyn Dep. at p. 175.) In his deposition, however, Finkelshteyn claims to have lost that audiotape. (*Id.* at p. 175.) In any event, Finkelshteyn clarified that during the purportedly recorded conversation, of which no specifics are alleged, Casella—and only Casella—made comments, although Pitta was alleged to have been present, (*Id.* at p. 174–180.)

November 10, 2005 justified his suspension for two reasons: (1) Finkelshteyn called in sick on short notice, leaving CTU supervisors no time to obtain nursing coverage for his shift; and (2) Finkelshteyn actually reported for work that day as a *per diem* nurse at SIUH affiliate North Shore University Hospital ("North Shore")[4]—thereby giving rise to an inference of malingering.

To support the contention that Finkelshteyn was, in fact, moonlighting on SIUH time, the Hospital presented Finkelshteyn's union representative with timesheets from North Shore, confirming that Finkelshteyn did in fact work at North Shore on November 10th. On the basis of that presentation, Finkelshteyn's union representative advised him to withdraw his grievance and serve his suspension. Finkelshteyn did so. Finkelshteyn claims, however, that he withdrew his grievance only to avoid a protracted and potentially damaging dispute, but that such withdrawal was not an admission.

For purposes of this lawsuit, Finkelshteyn does not deny that he did, in fact, work as a *per diem* nurse at North Shore on November 10, 2005. According to Finkelshteyn, however, the nature of his injury—an infected knee—presented a health risk to critically ill CTU patients but that there was no such danger in his more routine work at North Shore, permitting him to work there safely. There is no indication from the record, however, that this explanation was ever communicated to his union representative or to SIUH administrators during the grievance hearing or at any other time prior to the commencement of this lawsuit.

Despite withdrawing his grievance and serving his suspension, Finkelshteyn claims that the suspension was pretextual

and motivated by Pitta's anti-Semitic animosity. Here, he claims no direct evidence of anti-Semitism by Pitta, but rather claims that such bias is inferable from Pitta's close relationship with Casella and Pitta's alleged tolerance of Casella's racial and anti-Semitic remarks:

Q: ... Now, did anyone else other than Maria make offensive comments that were against your Jewish faith?

A. Not that I know. I know that most of them joke with Maria Casella, they were like sister and brother.

Q. But did he [Pitta] say anything verbally that was anti-Semitic? Did you ever hear him saying anything?

A. No.

Q. But [Pitta] would smile and laugh—

A. Yes.

(Finkelshteyn Dep. at p. 59.)

To further support an inference of pretext, Finkelshteyn testified that Pitta and Casella failed to discipline other CTU nurses for attendance violations, a fact to which he alludes in his December 2005 letter. At his deposition, Finkelshteyn asserted general, anecdotally based claims that non-Jewish nurses Picone, Levoyce, and Leach, and others, were afforded particularly favorable treatment with respect to their absences. (*Id.* at pp. 147–53.) Apart from his own deposition testimony, Finkelshteyn proffers no other evidence in support of these allegations.

SIUH denies that Finkelshteyn's suspension was pretextual. In support of a non-discriminatory basis for the suspension, SIUH presents documentary evidence establishing Finkelshteyn's long history of absenteeism. For example, beginning in July 2004, Pitta issued Finkelshteyn three disciplinary warnings for attendance failures: July 14, 2004 (for

4. North Shore is affiliated with SIUH.

three absences between April and June 2004, stating: "progressive discipline to follow if attendance does not improve"); March 18, 2005, (documented verbal warning for three absences between January and March 2005); and July 15, 2005 (documenting four absences between March and July 2005). Finkelshteyn did not challenge any of these disciplinary warnings, nor did he ever, prior to December 2005, suggest that these warnings were motivated by improper discrimination of any kind.

It is SIUH's position that each of the above warnings was issued in accordance with SIUH's written attendance policy. Pursuant to that policy, "[m]ore than two (2) occurrences of absence, patterned absence, or lateness in a three (3) month period for a full time employee is considered excessive."[5] Attendance is described as "important ... for the efficient operation of the hospital in delivering patient care and the proper function of the department." The policy thus grants supervisors authority to discipline employees even for "documented illness" and "injuries" in the event that those ailments become "chronic, and ... are causing staffing hardships in their departments," and mandates the following supervisory action:

1. The supervisor will review the attendance record of each employee at least every three (3) months. Employees who are identified as having a problem are expected to be tracked more often and should be addressed as soon as they exceed the standard.

2. If an employee exhibits chronic absenteeism, patterned absences, or recurring lateness, progressive discipline will commence, as outlined below. Excessive and/or chronic absenteeism can be

tracked for illness/injury, as well as for unexcused absences....

*Progressive Discipline:*

After management has communicated the standards and expectations of attendance and punctuality to the staff, progressive discipline should be taken as follows:

Formal Verbal Warning

Formal Written Warning

2 Day Suspension

Discharge

Finkelshteyn concedes that he understood the requirements of SIUH's attendance policy and does not contest his history of poor evaluation ratings for attendance by prior supervisors, including the following:

1) *2001* evaluation: attendance rated 2.5 on a 1 to 5 scale (1 being "unacceptable," 5 being "excellent"). Supervisor Anna Marie Carluto noted as follows: "... his attendance during his probation ... not satisfactory."

2) *2002* evaluation: attendance rated 2.5. Carluto again noted the following: "I want to see an improvement in his attendance over the next year."

3) *2003* evaluation: attendance rated 2.5. Supervisor Ruth Reyes–Grannis noted as follows: "Goal for this year to improve attendance. A copy of attendance policy was provided and received."

4) *2004* evaluation: attendance downgraded 2.0. Reyes–Grannis reiterated a need to improve attendance.

With respect to prior disciplinary action, it appears that Finkelshteyn was issued disciplinary warnings for attendance fail-

---

**5.** With regard to part-time employees, which Finkelshteyn became after November 2005, SIUH's attendance policy is even more "strin-gent," expressly establishing as "excessive" "[m]ore than one (1) occurrence of absence or lateness in a three (3) month period ..."

ures by supervisors other than Pitta on at least three separate occasions:

1) July 5, 2000 (documenting verbal warning);

2) December 4, 2001 (documenting excessive absences during 3–month period from July—September 2001); and

3) July 16, 2003 (documenting excessive absences during 3–month period, and noting that attendance policy was provided and that monitoring will continue).

Although it appears that Finkelshteyn refused to sign certain of those disciplinary notices, it is undisputed that he declined to formally challenge any of these disciplinary actions.

Finally, in rebuttal to the allegation of disparate treatment, SIUH submits disciplinary records which indicate that Pitta and Casella did, in fact, discipline non-Jewish nurses for absenteeism. Indeed, prior to Finkelshteyn's suspension, the record indicates that CTU nurses Picone and Levoyce each received documented verbal warnings from Pitta on August 30, 2005 and October 17, 2005, respectively. CTU Nurse Leach received a verbal warning from Casella on July 19, 2005, and a written warning from Pitta on November 7, 2005. In addition, the record establishes that Pitta and Casella issued nine disciplinary notices to other non-Jewish nurses for attendance violations between May 2004 (when Pitta and Casella began managing the CTU) and July 2006 (when Finkelshteyn resigned).

### C. *Retaliation & Constructive Discharge*

Finkelshteyn claims that in response to his December 23, 2005 letter, SIUH retaliated against him by (1) failing to offer him fulltime employment pursuant to his January 13, 2006 request; (2) denying him an interdepartmental transfer; and (3) refusing to hire him as a *per diem* nurse following his July 2006 resignation. The factual circumstances of these allegations are set forth as follows:

In November 2005, Finkelshteyn voluntarily requested that his employment status be changed from fulltime to part-time. Subsequently, in January 2006, Finkelshteyn wrote to Pitta requesting reinstatement to fulltime work. On January 23, 2006, that request was denied. Finkelshteyn was told that there were no fulltime night-shift CTU positions available, but that his request would be kept on file. Finkelshteyn does not allege any facts to controvert SIUH's position that no fulltime CTU positions were available.

Subsequent to his November 2005 suspension and January 2006 grievance proceeding, Finkelshteyn attempted to use SIUH's computerized personnel system to request an interdepartmental transfer to another SIUH unit. Pursuant to SIUH policy, he was deemed temporarily ineligible to do so because of his record of disciplinary suspension.

On July 13, 2006, Finkelshteyn tendered his letter of resignation, effective August 13, 2006. Finkelshteyn's stated ground for resignation was his inability to obtain fulltime CTU employment. After resigning, Finkelshteyn requested *per diem* work, but that request was also denied. In a letter dated August 23, 2006, SIUH made clear that it had accepted Finkelshteyn's resignation and would not be utilizing his services as a *per diem* nurse because Finkelshteyn had received but cancelled several overtime opportunities that had been extended to him in his last weeks of employment. Finkelshteyn does not deny that overtime opportunities were extended, but claims scheduling problems by CTU supervisors were the cause of his absences.

Finkelshteyn alleges that after his employment ended, he filed his claims with the United States Equal Opportunity Commission, and subsequently received a "right to sue" letter.

## DISCUSSION

### Summary Judgment Standard

In the summary judgment context, the evidence adduced must be construed in the light most favorable to Finkelshteyn, as the non-movant. *See, e.g., Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.2001). Summary judgment is appropriate only where there exists no genuine issue of material fact, and the onus to establish the absence of such factual issues falls squarely upon SIUH as the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon such showing, the onus shifts to Finkelshteyn to present evidence sufficient to satisfy every element of the claim. In so doing, Finkelshteyn is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. But in assessing the record to determine whether there is a genuine issue to be tried as to any material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in Finkelshteyn's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In discrimination cases, the merits typically turn upon an employer's intent, necessitating abundant caution in granting summary judgment for the employer. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.2008). Naturally, where an employer has acted with discriminatory intent, direct evidence of that intent will only rarely be available, thus "affidavits and depositions must be carefully scrutinized for circumstantial proof, which, if believed, would show discrimination." *Id.* (quoting *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)). Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment. *Id.*

### Title VII Claims

Finkelshteyn's Title VII discrimination claims stem from two broad factual allegations: that he was subjected to (1) a hostile work environment, and (2) disparate and discriminatory treatment with respect to his duties, responsibilities, discipline and opportunities for promotion. As a result of a confluence of these conditions, Finkelshteyn alleges that he had no choice but to resign, thus suffering an adverse employment action motivated solely by his employer's alleged discriminatory animus. Next, Finkelshteyn cites SIUH's subsequent decision to deny his request for reinstatement as the predicate for a Title VII retaliation claim. Although Finkelshteyn's claims are interrelated, the genesis of each is the pervasively discriminatory (namely, anti-Semitic) environment alleged to exist at SIUH. This court first addresses the hostile work environment claim before turning to an analysis of disparate treatment, retaliation and constructive discharge.

#### A. Hostile Work Environment

 Upon a review of the record, Finkelshteyn's allegations, taken in the most favorable light, raise triable questions of fact sufficient to sustain a hostile work environment claim. Summary judgment is therefore inappropriate. To assert a viable hostile work environment claim plaintiff must establish the following elements: (1) that his workplace was permeated with discriminatory intimidation,

ridicule and insult sufficiently severe or pervasive as to alter the conditions of his work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). The conduct in question "must be severe or pervasive enough to create an environment that 'would reasonably be perceived, and is perceived, as hostile or abusive.'" *Schwapp*, 118 F.3d at 110. In other words, the first element of a hostile work environment claim requires allegations that demonstrate that the environment was *both* objectively and subjectively hostile. *See Gregory v. Daly*, 243 F.3d 687, 691–92 (2d Cir.2001).

▮▮ To establish a hostile work environment claim plaintiff "must prove more than a few isolated incidents of [discriminatory] enmity. Casual comments, or accidental or sporadic conversation, will not trigger equitable relief pursuant to the statute." *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986) (citations omitted). There is no "magic" threshold number of harassing incidents that are required to state a claim. *Butler v. Potter*, No. 06–CV–3828, 2009 WL 804722, at *14 (E.D.N.Y. Mar. 26, 2009). Rather, a hostile work environment is determined by "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir.2000) (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

▮▮ At the outset, this Court agrees with SIUH that certain of Finkelshteyn's principal examples of alleged anti-Semi-

tism are meritless—his political dispute with a co-worker for example. While certain of his co-workers may disagree with Finkelshteyn's position on volatile geo-political issues, Finkelshteyn's characterization of this particular exchange, which does not allege the use of incendiary language, racial epithets or other hallmarks of racial animus, does not give rise to an inference of a severe or pervasive environment of anti-Semitism. *See, e.g., Shabat v. Blue Cross Blue Shield of Rochester Area*, 925 F.Supp. 977, 981–86 (W.D.N.Y.1996). Similarly, comments about Finkelshteyn's tattoo do not advance his hostile work environment claim. Here too, Finkelshteyn fails to allege the use of incendiary language or overtly discriminatory epithets. Moreover, even he concedes that his co-worker's reactions just as likely reflected their shock at his new and admittedly prominent tattoo than mockery of his faith. Accordingly, neither incident gives rise to any reasonable inference of discrimination, and cannot arguably have contributed to a pervasively hostile environment.

▮▮ Unlike the incidents described above, Casella's comments raise different issues. Unlike the conduct of mere co-workers, the actionable conduct of a supervisor—as Casella is here—may be imputed to SIUH as a matter of law. *Dawson v. County of Westchester*, 351 F.Supp.2d 176, 188 (S.D.N.Y.2004) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.")). Finkelshteyn alleges that Casella was a generally offensive personality, and claims personally to have overheard examples of Casella's bigotry on at least two specific occasions: one in which Casella made ra-

cially offensive remarks about a Chinese co-worker, going so far as to threaten to "fire this fucking Chinese bitch," and another in which Casella made blatantly anti-Semitic remarks about a difficult Jewish patient. As troubling as the two racist remarks Finkelshteyn overheard, is the one he didn't. Finkelshteyn's CTU co-worker, Stanislav Lando, testified that he overheard Casella say, "We have three problems on this unit—the Blacks, the Chinese, and the Jews," and then over-heard Casella describe Finkelshteyn as a "Jew Head," saying, ". . . we'll get rid of him soon enough." The determination on summary judgment is whether these incidents are sufficient to establish a prima facie case that anti-Semitic hostility within the CTU environment was severe and pervasive. This Court finds that when viewed in context they are.

■ Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency. A claim that "my co-worker is unpleasant," or even that "my co-worker is a racist," does not, standing alone, support a claim a for a hostile work environment. *Curtis v. Di-Maio,* 46 F.Supp.2d 206, 214 (E.D.N.Y. 1999) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (isolated or sporadic comments do not support a claim of hostile work environment)). Nonetheless, the incidents complained of here are instances in which Finkelshteyn's supervisor invoked patently offensive epithets—at least one of which was specifically directed

at him. And, although this Court is not prepared to say that three instances of racist remarks over the two-year period complained of necessarily constitute an environment of pervasive hostility, Finkelshteyn's contention is that Casella's bigoted commentary was a matter of routine. Indeed, Lando's sworn affidavit seems to corroborate that view, independently describing events in which Casella would resort to racially or religiously denigrating commentary. More importantly, Lando's testimony corroborates Finkelshteyn's contention that (a) Casella's discriminatory animus tended toward anti-Semitism, (b) that her discriminatory animus was focused, at least in part, on him, and (c) that within the CTU community Casella made her animosity toward Finkelshteyn publicly known, and made no secret of her stated intention to "get rid of him." On summary judgment, the quality and quantity of the incidents described both by Finkelshteyn and Lando is sufficient to raise triable questions better left for a jury.

Even if the incidents described immediately above were not alone sufficient to create a jury question, they did not occur in a vacuum. The record indicates that Casella's alleged anti-Semitic animus became manifest when she deliberately subjected Finkelshteyn to an oppressive work schedule; a fact that SIUH does not deny, and which also appears to be corroborated by the deposition testimony of yet another non-party witness and CTU employee, Violeta Coleman.[6] It is Coleman's testimony that Finkelshteyn was subjected to substantially more difficult work assignments than his co-workers, a fact that was

---

**6.** Although the imposition of an oppressive work schedule might also support a disparate treatment claim, it is pled here only in support of Finkelshteyn's hostile work environment claim. On that basis, and the uncontested fact that the matter was timely and satisfactorily resolved by SIUH management,

see *Taylor v. Small,* 350 F.3d 1286, 1293 (D.C.Cir.2003) (holding that Title VII defendants may avoid liability by curing adverse employment action prior to commencement of an action), the Court declines to *sua sponte* fashion these allegations into a disparate treatment claim at this eleventh hour.

common knowledge among CTU employees. In fact, from the record, it appears that Pitta, the CTU's supervisor, found it necessary to step in and correct Finkelshteyn's work schedule. If true, this evidence leads to the reasonable inference that Finkelshteyn's schedule was, in fact, disproportionately more difficult.

Although, it is undisputed that in complaining about his unfair workload, Finkelshteyn did not, at that time, attribute his burdensome schedule to anti-Semitic bigotry, the record arguably traces the progression of hostility from a supervisor's general anti-Semitic commentary to a widely observable adverse employment action.[7] Such circumstances are sufficient to support a reasonable inference of an actionably hostile work environment. *Raniola v. Bratton*, 243 F.3d 610, 622–23 (2d Cir. 2001) (reversing dismissal of hostile work environment claims where circumstances surrounding "inordinately high work quotas" supported an inference of hostile work environment motivated by impermissible discrimination); *Towers v. State Univ. of New York at Stony Brook*, No. 04–CV–5243, 2007 WL 1470152, at *2 (E.D.N.Y. May 21, 2007) (declining to dismiss hostile work environment claim where plaintiff adequately alleged overwhelming workload based on gender). For these reasons, as to Finkelshteyn's claim of hostile work environment, summary judgment is denied.

## B. *Disparate Treatment*

Finkelshteyn also complains that in November 2005, he was unfairly suspended for absenteeism, an adverse employment action that Finkelshteyn claims was motivated by religious animus. With respect to this disparate treatment claim, Finkelshteyn fails to sufficiently establish either a prima facie case of discrimination or an inference of discriminatory pretext necessary to rebut SIUH's proffered legitimate, non-discriminatory basis for its disciplinary action. Summary judgment for SIUH is therefore appropriate.

 Pursuant to *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff bears the initial burden of establishing a prima facie case of discrimination. To do so, he must show (1) that he is a member of protected class; (2) that he has performed his job satisfactorily; (3) that he has suffered an adverse employment action; and that (4) that action occurred under circumstances giving rise to an inference of discrimination. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir.2006) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817); *Ganzy v. Sun Chemical Corp.*, No. 06–CV–3424, 2008 WL 3286262, at *4 (E.D.N.Y. Aug. 8, 2008). If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, non-discriminatory reason" for its action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. Should the defendant carry this burden the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were merely a pretext for discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101

---

7. This Court notes that, it does appear that SIUH took timely action to address Finkelshteyn's burdensome work schedule. Nonetheless, SIUH does not assert an affirmative defense on the basis of timely remedial action, nor does it appear that such a defense would lie in the hostile work environment context. *See Dawson*, 351 F.Supp.2d at 188 (" "[W]hen the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment," an employer is not entitled to any affirmative defense and will be held strictly liable for the supervisor's harassment.") (quoting *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257).

S.Ct. 1089, 67 L.Ed.2d 207 (1981). However, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089. Thus, a court must enter summary judgment for a defendant when the plaintiff either fails to put forth a prima facie case, or fails to present legally sufficient evidence contradicting a wellpresented, legitimate reason offered by the defendant for the adverse employment action. *Wong v. Kings County Dist. Att'ys Office,* No. 02–CV–3740, 2004 WL 692165, at *3 (E.D.N.Y. March 31, 2004).

■ While courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp,* 118 F.3d at 110, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu–Brisson v. Delta Air Lines, Inc.,* 239 F.3d 456, 466 (2d Cir.2001). And, although district courts must pay careful attention to affidavits and depositions which may reveal circumstantial proof of discrimination, see *Gallo,* 22 F.3d at 1224, courts are not to " 'treat discrimination differently from other ultimate questions of fact,' " *Abdu–Brisson,* 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Thus, although it is difficult for courts to ascertain discriminatory intent, courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture." *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 448 (2d Cir.1999).

■ With respect to Finkelshteyn's prima facie case, there is no question that (1) Title VII's protections apply to allegations of anti-Semitic discrimination (see 42 U.S.C. § 2000e(j); *Leifer v. N.Y. State Div. of Parole,* No. 04–CV–571, 2007 WL 203961, at *6 (E.D.N.Y. Jan. 24, 2007) (applying Title VII protections to claims of anti-Semitic conduct); (2) that apart from certain absences, SIUH does not contest Finkelshteyn's adequate performance as a nurse; and that (3) his two-day suspension qualifies as an adverse employment action) (see, e.g., *Satterfield v. United Parcel Serv., Inc.,* No. 00–CV–7190, 2003 WL 22251314, at *11 (S.D.N.Y. Sept. 30, 2003)). But, Finkelshteyn fails to establish the necessary fourth element of his prima facie case; i.e., that a discriminatory motivation for his suspension is inferable from the facts.

In this case, Finkelshteyn fails to allege any direct evidence of bias on Pitta's part. Indeed, despite Pitta's two years of CTU supervision, Finkelshteyn cannot recall even a single instance in which Pitta uttered discriminatory epithets, jokes or remarks or engaged in any other affirmative conduct that would constitute direct evidence of bias. *Grillo v. N.Y. City Transit Auth.,* 291 F.3d 231, 235 (2d Cir.2002) (dismissing the plaintiff's Title VII claim for racial discrimination because the plaintiff failed to submit evidence of racial animus on the part of those involved in his termination); *Duclair v. Runyon,* 166 F.3d 1200, 1200 (2d Cir.1998) (concluding that the plaintiff failed to establish a prima facie case of discrimination when the evidence showed that the plaintiff's supervisor disliked him personally but never made a derogatory racial or ethnic remark). Instead, Finkelshteyn seeks to bridge the causation gap by arguing that Pitta's discriminatory motives are nonetheless inferable based upon the imputable prevalence of anti-Semitism in the CTU created by Casella and Casella's influence over Pitta in particular. *See, e.g., Brown v. AstraZ-*

*eneca Pharm., L.P.*, No. 03–CV–6166, 2006 WL 2376380, at *8 (E.D.N.Y. Aug. 16, 2006) (holding that plaintiff may establish the necessary inference of discrimination where persons with discriminatory animus influenced the actual decisionmaker, even if the latter did not consciously discriminate); *Sadki v. SUNY Coll. at Brockport*, 310 F.Supp.2d 506, 513–14 (W.D.N.Y.2004). To proceed on this theory, however, Finkelshteyn must allege facts sufficient to establish a nexus between the cited examples of alleged anti-Semitic behavior and the November 2005 disciplinary suspension. *Brown*, 2006 WL 2376380 at *7. That nexus is lacking here.

Even viewing the facts in the most favorable light, Finkelshteyn alleges only that Pitta was present when a co-worker commented that Israelis should leave Gaza and when co-workers laughed at his tattoo. As neither of these incidents is indicative of discrimination, Pitta's participation, even if proven, does nothing to reasonably suggest either actual anti-Semitism on his part, or undue influence on his decision making. Moving next to Finkelshteyn's more general allegation—that Pitta was typically within earshot when Casella conducted herself in a rude and offensive manner—Finkelshteyn fails to identify any reasonable connection between Casella's generally obnoxious behavior and the circumstances surrounding his November 2005 suspension. There is no evidence that Pitta was ever present for or participated in Casella's alleged anti-Semitic tirades, either when she called a patient a "Jew Head," or when she similarly referred to Finkelshteyn and threatened to "get rid of him." Pitta's connection to those specific incidents, if shown, and if proven to be in temporal proximity to the suspension decision, might come closer to raising a triable inference that Casella's discriminatory influence lead to Finkelshteyn suspension; but no such facts are alleged here. To the contrary, Finkelshteyn's barebones "influence" theory turns on an unsupported deduction that because of their friendship, Casella's animus must be Pitta's animus. Such rank speculation, however, cannot withstand summary judgment. *Cf. Brown*, 2006 WL 2376380 at *7 (dismissing conclusory allegations that friendship between supervisor and allegedly racist co-workers must have influenced decisionmaker to "push" for plaintiff's termination on racially motivated grounds); *Patterson v. County of Oneida*, 375 F.3d 206, 212–13, 221–24 (2d Cir.2004) (concluding that the plaintiff did not present evidence giving rise to an inference of racial discrimination when the plaintiff showed a past pattern of racially hostile conduct by co-workers but failed to provide any evidence of bias on the part of the individuals who made the decision to terminate the plaintiff).

Rather than suggesting that Pitta engaged in his own anti-Semitic discrimination or that he was unduly influenced by others, the record indicates that, in suspending Finkelshteyn, Pitta acted in strict accordance with SIUH's written policies. Pursuant to that policy "[m]ore than two (2) occurrences of absence, patterned absence, or lateness in a three (3) month period for a full time employee is considered excessive." The rigor of SIUH's policy is described as "important ... for the efficient operation of the hospital in delivering patient care and the proper function of the department." Indeed, so essential does SIUH consider the need for attendance and punctuality that, pursuant to its policy, supervisors are granted the authority to discipline employees even for "documented illness" and "injuries" in the event that those ailments become "chronic, and ... are causing staffing hardships in their departments." As such, even documented illness of the type Finkelshteyn alleges

may properly be considered in a disciplinary decision where those absences adversely affect nurse scheduling. SIUH's attendance policy, which applies uniformaly to all employees, sets forth attendance expectations and the explicit disciplinary "consequences" for failing to meet those standards.

In this case, Finkelshteyn concedes that he was well aware of SIUH's admittedly "stringent" attendance policy and does not deny that his attendance had been consistently cited as a source of concern not only by Pitta but by prior supervisors as well. Indeed, as set forth more fully above, his performance evaluations from 2001 through 2004 showed consistently poor attendance-his scores in that regard never exceeding a 2.5 on a 1 to 5 scale (1 being "unacceptable," 5 being "excellent"). Consistent with those negative attendance reviews, Finkelshteyn was issued disciplinary warnings for attendance failures on three separate occasions: July 5, 2000 (documenting verbal warning), December 4, 2001 (documenting excessive absences (4) during 3–month period from July—September 2001), and July 16, 2003 (documenting 3 absences during 3–month period, noting that attendance policy was provided, and that monitoring will continue). Each one of those warnings was issued by prior supervisors, to whom no discriminatory animus is attributed. Moreover, even the documentary evidence submitted by Finkelshteyn in opposition to the instant motion supports SIUH's view that Finkelshteyn's absences were problematic and continued to cause scheduling difficulties for CTU staff. For example, Violeta Coleman testified that Finkelshteyn had a reputation among CTU employees for routinely calling in sick or arriving late, conduct she personally observed and which caused her difficulty in ensuring proper patient coverage during those times when she was responsible for arranging nurse schedules. (Colman Dep. at 17–20.) [8]

Although Coleman concedes that, based on Finkelshteyn's absences, his attendance was scrutinized more so than others, that fact alone is not indicative of impermissible discrimination, see, e.g., *Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y.2001) ("Courts ... have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions."); to the contrary, heightened scrutiny is a circumstance expressly contemplated and required by SIUH policy, which states in no uncertain terms that "[e]mployees who are identified as having a problem are expected to be tracked more often and should be addressed as soon as they exceed the standard." In such cases, and as discussed above, SIUH policy requires that employees exhibiting "chronic absenteeism, patterned absences, or recurring lateness," be subject to "progressive discipline," even where, as here, the absences in question are due to legitimate "illness or injury;" such is the apparent import and necessity of consistent staffing for SIUH patients.

Finkelshteyn's anecdotal comparator evidence does not suggest that SIUH's policy was selectively enforced against him, or

---

**8.** Coleman testified, in pertinent part, as follows:

> A. You heard it on the unit and, you know—he would call in late. Uh, a couple of times on a shift, he would call for somebody to cover and it did get back to the Managers that he was calling in late and the other Nurses were getting mad that he wasn't showing up on time. And, that might have been because he had another job.
> I'm not sure
> And, so you just heard that generally out there grumbling about him coming in late.
> (Colman Dep. at p. 17.)

that it otherwise went unenforced with respect to non-Jewish nurses. Contrary to the naked allegations set forth in Finkelshteyn's December 2005 letter and in his deposition testimony, SIUH disciplinary records indicate that prior to Finkelshteyn's suspension CTU nurses Picone and Levoyce each received documented verbal warnings from Pitta on August 30, 2005 and October 17, 2005, respectively. CTU Nurse Leach received a verbal warning from Casella on July 19, 2005, and a written warning from Pitta on November 7, 2005. In addition, the record establishes that Pitta and Casella issued nine disciplinary notices to other non-Jewish nurses for attendance violations between May 2004 (when Pitta and Casella began managing the CTU) and July 2006 (when Finkelshteyn resigned).

In light of Finkelshteyn's well-documented absenteeism, the express requirements of SIUH policy, and the complete lack of any specific evidence of anti-Semitic motivation or undue influence in the suspension decision, no reasonable jury could find other than that progressive discipline, including suspension, was warranted, and that such discipline was, in fact, issued on a non-discriminatory basis, as set forth in SIUH's discipline/attendance policy. Summary judgment is therefore granted as to Finkelshteyn's claim of disparate treatment.

### C. *Retaliation*

For the reasons below, Finkelshteyn various retaliation claims are dismissed.

■ First, Finkelshteyn's claim that his January 2006 request for reinstatement to fulltime CTU employment was unjustly denied is unavailing. Fatal to this claim is Finkelshteyn's basic failure to show, as he must, the actual availability of an open employment position. *See Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (holding that the burden rests with the plaintiff to demonstrate that rejection did not result from the two most common legitimate reasons: (1) an absolute or relative lack of qualifications or (2) the absence of a vacancy in the job sought). To the contrary, SIUH affirmatively states that after Finkelshteyn voluntarily requested a change to part-time status, his former fulltime nightshift position was not filled because the shift was deemed adequately staffed. On that basis, SIUH avers that Finkelshteyn's former position was not vacant, and alleges that no other fulltime CTU nightshift nurses were hired between Finkelshteyn's request for reinstatement and his resignation date in July 2006. Finkelshteyn does not dispute these facts:

Q. Between January 13, 2006 and July 14, 2006, do you know of any employee, any nurses that were hired for a full-time position in nights in the open heart surgery unit [CTU]?

A. I'm not aware.

(Finkelshteyn Dep. at p. 238.) Summary judgment is therefore appropriate.

■ Second, Finkelshteyn complains that, pursuant to SIUH policy, his disciplinary suspension rendered him ineligible for interdepartmental transfer for a one-year period. The facts on this point are not disputed, but it is clear that Finkelshteyn asserts not a retaliation claim, but yet another side-door challenge to his November 2005 suspension. That the suspension remained on Finkelshteyn's record—rendering him ineligible to transfer—is based on SIUH's ratification of that suspension and Finkelshteyn's own failure to further challenge the matter.

During the grievance proceeding, SIUH administrators, including Human Resources Director Erica Cotto, were informed of Finkelshteyn's allegations of

anti-Semitic bias and were aware that Finkelshteyn had obtained medical leave for certain of the absences at issue; nonetheless, SIUH ratified the suspension in light of (a) evidence that Finkelshteyn was malingering to work for another facility, and (b) his calling in sick on short notice, even if medically excused, caused actionable hardship in obtaining nursing coverage for the CTU. For these reasons, SIUH found his suspension independently justified, even assuming, *arguendo,* that its initial issuance was predicated on unfair discrimination. *Conn v. GATX Terminals Corp.,* 18 F.3d 417, 420 (7th Cir.1994) (Posner, J.) (holding that if a supervisor actuated by discriminatory motives recommends adverse action, where the company effects that action on nondiscriminatory grounds, it is not guilty of discrimination, because the discriminatory motive of the supervisor made no difference; the causal element that is a required part of every tort case is missing). There is no suggestion made that Cotto, or other Human Resources personnel themselves acted out of anti-Semitic malice, nor is there any suggestion that their decision to ratify the suspension was necessarily predicated on anything other than objective evidence that Finkelshteyn was working at another hospital while allegedly out sick from SIUH, and that those "out sick" calls were made on short notice.

Rather than challenging that determination further, Finkelshteyn withdrew his grievance and accepted his suspension with full knowledge of the possible consequences, including ineligibility for transfer. That Finkelshteyn now claims to have been pressured into withdrawing his grievance by his union representative has no bearing on the propriety of SIUH's decision; that withdrawal was not the result of any conduct by SIUH. For these reasons, this claim is without merit and summary judgment in SIUH's favor is appropriate.

As his final ground for retaliation, Finkelshteyn complains that after his July 2006 resignation, Cotto denied his request to continue working in the CTU on a *per diem* basis. Cotto, against whom no allegations of discriminatory bias are made, cited Finkelshteyn's attendance record as the basis for SIUH's refusal to extend him further *per diem* employment. In addition, the record indicates that for the relevant time period from April 30, 2006 through August 11, 2006, Finkelshteyn cancelled overtime assignments seven times on less than the requisite 72 hours notice. Although Finkelshteyn testified that he did not know whether the specific dates were accurate, he did admit that he cancelled overtime on short notice. In light of Finkelshteyn's failure to allege any facts that might cast suspicion on SIUH's non-discriminatory basis for refusing to further extend him employment, his claim is dismissed.

### D. *Constructive Discharge*

Finally, Finkelshteyn claims that because of SIUH's hostile and intimidating environment, he was "forced" to resign his nursing position, that claim is unavailing. The constructive discharge of an employee will occur only "when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily.... Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Chamblee v. Harris & Harris. Inc.,* 154 F.Supp.2d 670, 675 (S.D.N.Y.2001); *see also Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir. 1983). Accordingly, the "[c]reation of a hostile work environment is a necessary predicate to a hostile-environment con-

structive discharge case." *Penn. State Police v. Suders*, 542 U.S. 129, 149, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004). But a hostile working environment is not enough. *Suders*, 542 U.S. at 149, 124 S.Ct. 2342 (describing constructive discharge as an "*aggravated* case of hostile work environment") (emphasis added); *O'Neal v. State Univ. of N.Y.*, No. 01–CV–7802, 2006 WL 3246935, at *12 (E.D.N.Y. Nov. 7, 2006); *Shull v. Rite Aid Corp.*, No. 94–CV–8552, 1997 WL 289460, at *8 (S.D.N.Y. May 30, 1997). Indeed, "unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Trinidad v. N.Y. City Dep't of Corr.*, 423 F.Supp.2d 151, 168 (S.D.N.Y.2006)

■ Nothing in the record indicates that after complaining of discrimination in December 2005, Finkelshteyn's working conditions became so intolerable that his resignation was compelled. To the contrary, rather than establishing sufficiently intolerable working conditions, the record clearly establishes that Finkelshteyn sought to return to work on a fulltime basis or, at the very least, as a *per diem* employee. This fact alone undercuts his contention that the hostile environment in the CTU was sufficient to compel his resignation. *See, e.g., Trinidad*, 423 F.Supp.2d at 168 (dismissing constructive discharge claims, finding working conditions not sufficiently intolerable where plaintiff characterized her resignation as a mistake and sought reinstatement one month later).

Moreover, reviewed in its entirety, the record suggests that Finkelshteyn's July 2006 resignation was motivated not by the hostility of his environment, at least not in the sense of anti-Semitic harassment, but born of his professional frustration, principally with his inability to obtain more than part-time CTU employment or to transfer to another SIUH department. This predicament, even if discriminatorily motivated, does not suffice to establish a claim for constructive discharge. *See Martin v. Citibank*, 762 F.2d 212, 221 (2d Cir.1985) (citing *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61 (5th Cir.1980) (resignation due to lower pay resulting from sex discrimination does not constitute constructive discharge); and *Muller v. U.S. Steel Corp.*, 509 F.2d 923, 929 (10th Cir.1975) (unfavorable job assignment and discriminatory failure to promote does not constitute constructive discharge)). Based on the foregoing, Finkelshteyn's constructive discharge claim is dismissed.

## CONCLUSION

For the reasons discussed above, SIUH's motion for summary judgment as to Plaintiff's hostile work environment claim is DENIED. In all other respects, the motion is GRANTED, and all other claims are dismissed.

SO ORDERED.